ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| GLORIA CARDONA ALDARONDO<br><br>Apelado<br><br>v.<br><br>MADERERA DONESTEVEZ INCORPORADA; UNIVERSAL INSURANCE COMPANY; PUERTO RICO WOOD TREATING INDUSTRIES, INC, Y JUAN DEL PUEBLO<br><br>Apelante | TA2025AP00286 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm. E DP2016-0009<br><br>Sobre: Daños y perjuicios |
| --- | --- | --- |

Panel integrado por su presidenta, la Jueza Domínguez Irizarry, la Jueza Rivera Marchand y el Juez Salgado Schwarz.

Rivera Marchand, Jueza Ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 20 de marzo de 2026.

Comparecen Maderera Donestevez Incorporada (Maderera Donestevez), Universal Insurance Company (Universal) y Puerto Rico Wood Treating Industries, Inc. (PRWT) (en conjunto, parte apelante) y solicitan que revoquemos la *Sentencia Final,* que el Tribunal de Primera Instancia, Sala Superior de Caguas (TPI o foro primario) notificó, el 31 de julio de 2025.[1] En el aludido dictamen, el TPI declaró *Ha lugar* la *Demanda* sobre responsabilidad civil extracontractual que la señora Gloria Cardona Aldarondo (señora Cardona Aldarondo o apelada), presentó en contra de Maderera Donestevez y Universal. Asimismo, condenó a Maderera Donestevez al resarcimiento monetario por concepto de daños y perjuicios, así como por los gastos reclamados.

---

[1] Véase, el Sistema Unificado de Administración y Manejo de Casos (SUMAC TA), Entrada Núm.1, Apéndices 2-3.

Por los fundamentos que esbozamos a continuación, confirmamos el dictamen apelado.

**I.**

El caso de autos tiene su génesis, el 21 de enero de 2016, cuando la señora Cardona Aldarondo instó la presente *Demanda* en contra de Maderera Donestevez y Universal.[2] En síntesis alegó que, en marzo de 2013, comenzó la construcción de su residencia en el municipio de Aguas Buenas, y como parte de los materiales, adquirió maderas tratadas de Maderera Donestevez. Sostuvo que, les solicitó orientación a los empleados de Maderera sobre la madera más adecuada para la construcción de su propiedad con fines residenciales y que, en ningún momento, estos le informaron sobre el tipo de tratamiento que tenía la madera adquirida.

Añadió que, tras concluir la construcción y ocupar la residencia comenzó a enfrentar problemas de salud, por los cuales requirió asistencia médica y descubrió la presencia de arsénico en su cuerpo, así como otros químicos. En vista de ello, le realizó pruebas a la madera adquirida, cuyos resultados evidenciaron la presencia del químico arseniato de cobre cromatado (CCA, por sus siglas en inglés), el cual contiene arsénico.

A su vez afirmó que, en el año 2003, el producto CCA fue retirado voluntariamente del mercado y la *Environmental Protection Agency* (EPA) prohibió su uso para fines residenciales. Ello, debido a que el CCA puede ocasionar condiciones de salud, tales como: daños neurológicos, mareos, desorientación, enfermedades autoinmunes, enfermedades cardiovasculares, deficiencias hormonales, aumento de riesgo de cáncer, entre otros. Sostuvo que, las regulaciones federales exigen que se advierta a los consumidores sobre el contenido de CCA en productos como la madera tratada con el referido químico.

---

[2] *Íd.*, Apéndice 1.

Expuso que, a sabiendas de que sería utilizada para construir su residencia, Maderera Donestevez le vendió madera inapropiada para su uso, ya que había sido tratada con CCA. Añadió que, Maderera Donestevez no le advirtió ni cumplió con informar los riesgos del uso de una madera que fue objeto de dicho tratamiento.

Sobre tales bases, razonó que Maderera Donestevez respondía civilmente debido a su negligencia, responsabilidad vicaria y en concepto de responsabilidad estricta (conocida como la doctrina de *product liability)* al manufacturar y vender madera tratada con CCA, un producto no autorizado para los fines requeridos, sin proveer las advertencias de rigor. Además, por ocasionarle daños morales y la pérdida del uso y disfrute de su residencia. Sobre el particular especificó que, no podía ocupar su propiedad ni venderla, debido a su contenido de CCA, y se vio obligada a remover y restituir la madera contaminada. Consecuentemente, solicitó el resarcimiento por los daños y perjuicios.

El 31 de marzo de 2016, Maderera Donestevez y su aseguradora, Universal, contestaron la demanda.[3] En general, negaron responsabilidad por los hechos alegados. No obstante, admitieron que, en el año 2003, el CCA había sido retirado del mercado voluntariamente no por haber ocasionado problemas de salud, sino por haberse descubierto otro químico similar en efectividad, sin contener arsénico. Adujeron que, en Puerto Rico hay miles de casas construidas con madera tratada con CCA y que esta continúa utilizándose para ciertos usos residenciales. Agregaron que, resulta improbable que una persona se enferme por vivir en una residencia construida con madera tratada con CCA y, menos aún, que muestre síntomas luego de tres meses de residir en la misma. Asimismo, esgrimió que, la EPA no había encontrado

---

[3] *Íd.,* Apéndice 4.

productos contaminados en sus instalaciones comerciales, entre otras defensas afirmativas.

Posteriormente, el 19 de septiembre de 2016, la señora Cardona Aldarondo enmendó la demanda a los fines de incluir a PRWT como parte demandada.[4] Arguyó que esta respondía solidariamente de los daños alegados al no procesar la madera de manera adecuada, al no proveer las correspondientes indicaciones, ni tomar las medidas para identificar la madera tratada con CCA, sin advertir al público general de los riesgos e instrucciones del producto vendido. A su vez, enmendó las cuantías solicitadas como indemnización por los daños y perjuicios y gastos.[5]

En reacción, el 28 de noviembre de 2016, PRWT presentó *Contestaci[ó]n a Demanda Enmendada* en la cual negó las alegaciones esgrimidas en su contra y levantó, de forma similar, las defensas afirmativas de los codemandados, Maderera Donestevez y Universal.[6]

Culminado el descubrimiento de prueba, entre otros incidentes procesales, el foro primario dividió el curso de acción para inicialmente atender el reclamo principal de negligencia y, de proceder, más adelante valorar los daños. Durante el juicio, desfiló prueba testifical, pericial y documental, a los fines de determinar si tenía méritos el reclamo de la señora Cardona Aldarondo.[7] Cabe

---

[4] *Íd.*, Apéndice 5.

[5] El monto solicitado en resarcimiento por daños y perjuicios se particularizó de la siguiente forma: (1) $450,000.00, por la pérdida del uso y disfrute de la propiedad, así como los costos de reparación; (2) $300,000.00, por los daños físicos sufridos; (3) $400,000.00, por el miedo no especulativo de desarrollar cáncer debido a la exposición con arsénico, el cual es un carcinógeno; (4) $5,000.00, por inversión en tratamientos a los fines de disminuir tal exposición; (5) $30,000.00, por las pérdidas económicas debido a las dificultades en trabajar por las condiciones de salud; (6) $16,000.00, por la construcción de un sótano en su propiedad para poder tener dónde residir.

[6] SUMAC TA, Entrada Núm. 1, Apéndice 6.

[7] Por la parte demandante declararon: 1) señora Gloria Cardona Aldarondo; 2) arquitecto Karla M. Toledo García, cualificada como perita en arquitectura, especialmente en selección de materiales y los códigos de construcción; y, 3) ingeniero Sergio A. Caporali Filho, cualificado como perito especialista en higiene y determinación de riesgo. Por la parte demandada, declararon: 4) Dra. Angélica Bonilla Espino, cualificada como perita en patología clínica y anatómica; 5) ingeniero Fernando L. Rodríguez, cualificado como perito en ingeniería química, ambiental y sistema integrado de manejo ambiental, incluyendo higiene industrial; y 6) el señor Iván J. Donesteves de Parra.

señalar que, las partes estipularon que PRWT y Maderera Donestevez utilizaron *Chromated cooper arsenate* (*CCA Wolman Concentrate 60%*) y *Cooper Azole* como tratamiento para la madera.

El 1 de septiembre de 2021, el TPI notificó una *Sentencia Parcial*[8] en la cual formuló 158 determinaciones de hechos. A modo de sintetizar, destacaremos las siguientes:

1. Maderera, es un negocio de ventas de materiales de construcción y ferretería, fundada en 1961.
2. PRWT, es una afiliada de Maderera, fundada en 1984.
   […]
4. La demandante [apelada] es propietaria de una residencia localizada en Carr. 797, Km. 4.9, Barrio Jagueyes, Aguas Buenas, construida en columnas laterales de madera tratada, techada con madera tratada, con tejas de aluminio galvanizadas y cuatro balcones de madera.
   […]
18. Toda la casa se encuentra cubierta con madera tratada.
19. Toda la madera de la propiedad fue adquirida por la demandante en Maderera.
   […]
38. Tras comenzar a vivir en la residencia, la demandante comenzó a sentir que le ardía la comisura de los labios, que se le irritaba mucho la garganta, estaba casi sin voz, le comenzó a doler la pierna y se asustó cuando vio unas pelotas detrás de la rodilla.
   […]
41. La demandante veía en la casa un polvo como gris oscuro.
   […]
56. El polvo o residuo en la casa de la demandante ha estado presente todo el tiempo desde la construcción y continúa hasta el presente.
   […]
64. La perito de la demandante, [t]estificó que, a la vista, se percibe que la madera de la casa de la demandante fue tratada con CCA por su color verdoso azulado.
65. [S]e puede identificar la madera tratada en toda la facilidad.
66. El preservativo se utilizó en toda la madera alrededor de toda la propiedad.
67. [E]l CCA, es un pesticida o preservativo que ahuyenta de la madera las termitas y otros insectos.
68. La madera tratada con CCA ha sido restringida en su uso residencial debido a su alta toxicidad y al ser un carcinógeno para los seres humanos.
69. El uso del CCA está restringido de acuerdo a las categorías de los estándares de la American Wood Preservers Association (AWPA) de 2001.
   […]

---

8 *Íd.*, Apéndices 8 y 9.

84. Cualquier error en el manejo lleva una responsabilidad del distribuidor o vendedor.

85. La madera tratada con CCA sólo puede ser vendida para los usos autorizados, entiéndase uso marítimo, postes industriales o comerciales.

[...]

88. Se supone que se advierta al comprador sobre el tratamiento prestado a la madera con CCA.

[...]

90. En las facturas emitidas por la demandada no aparece ningún dato técnico sobre el pesticida utilizado, ni ninguna advertencia en cuanto a su uso.

91. Es necesario que se advierta al consumidor sobre la calidad de la madera y si tiene altos niveles de toxicidad, sobre cualquier riesgo a la salud, seguridad y bienestar.

92. Si la madera estaba mojada con CCA, debió apercibirse que era tóxica para la seguridad de la demandante y la de los trabajadores.

93. La madera no contiene la información que se supone que tenga de acuerdo a la cadena de distribución.

[...]

95. Este particulado [de CCA] afecta a las personas dentro de la propiedad debido a su toxicidad, al momento del tacto o inhalación puede tener un efecto adverso a la salud.

[...]

97. No hay evidencia de que la parte demandada hubiera cumplido con el proceso de manufactura, no hay evidencia de que se advirtió al consumidor sobre el manejo, no hay cadena de custodia y documentación, incluyendo *grademarks*.

98. La arquitecta concluyó en su informe que "[l]a madera utilizada como material de construcción primario de la residencia adolece de los sellos y advertencias necesarias".

99. Para corregir la situación en la casa, [l]a limpieza no es suficiente. [S]e tendría que remover toda la madera y construir de nuevo su casa.

[...]

103. El doctor Caporali concluyó que hay presencia significativa de arsénico en las vigas de la casa, [y] en las vigas del techo.

104. [C]oncluyó que el arsénico de la madera vendida provino del tratamiento prestado.

105. El doctor [e]xplicó que el arsénico es uno de los metales más tóxicos que hay y es excelente para matar termitas y personas.

[...]

107. Desde el 2003 existe una renuncia voluntaria de los manufactureros a utilizar CCA para el interior de la casa.

[..]

132. La perito de la parte demandada, Dra. Angelisa Franceschini, testificó que el producto obtenido de los estudios es el que se utiliza para tratar la madera, es arsénico, cromo y cobre.

[...]

134. Testificó que el arsénico es un elemento, que dependiendo de la exposición puede tener efectos tóxicos y que es carcinógeno.

143. El ingeniero admite en su informe pericial que, desde el 31 de diciembre de 2003, la aplicación y uso de este producto (*Wolman Concentrate 60%*) fue limitado por la EPA.

144. [R]econoció que los manufactureros voluntariamente retiraron la terminación de ciertos usos del CCA.

145. Señaló que el Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), requiere que los manufactureros indiquen cuál es el uso apropiado del pesticida y cuáles son los usos autorizados.

146. En su informe [i]ndicó que Maderera debe mantener los estándares de la AWPA.

[…]

150. Reconoció que el código de la AWPA C15 indica que el CCA no puede usarse para fines residenciales.

[…]

En esencia, el foro primario concluyó que la señora Cardona Aldarondo logró establecer causalidad adecuada entre la negligencia imputada y los daños sufridos. Indicó que, el manufacturero del producto y su vendedor son responsables de colocar en el mercado productos adecuados al uso que serán destinados y proveer advertencias al consumidor de los riesgos en la utilización del producto. Determinó que, la parte apelante incumplió con estos deberes e incurrió en negligencia y responsabilidad al no advertir sobre las limitaciones en el uso del CCA, con el que fue tratada la madera vendida a la señora Cardona Aldarondo. Dispuso que, la apelada tenía derecho a recuperar los daños y perjuicios sufridos. En su consecuencia, el TPI señaló una vista para determinar la valorización de los daños y perjuicios, así como los gastos reclamados.

No conteste, el 15 de septiembre de 2021, la parte apelante presentó una *Solicitud de Reconsideración y Solicitud de Relevo de Sentencia.*[9] En primer lugar, planteó que el dictamen debía ser modificado a los fines de que fuera intitulado como "Resolución" en vez de *Sentencia Parcial,* toda vez que no disponía de la totalidad de la reclamación, sino únicamente sobre el aspecto de la negligencia.

Por otro lado, arguyó que lo referente al etiquetado y las advertencias de pesticidas en productos está regulado por legislación federal; específicamente, por la *Federal Insecticide,*

---

[9] SUMAC TA, Entrada 1, Apéndice 10.

*Fungicide, and Rodenticide Act* (FIFRA), 7 U.S.C. sec. 136(a) *et seq.* En ese sentido, expuso que el estatuto federal no imponía deberes de etiquetar madera tratada, por lo cual, el foro primario está impedido de exigirle requisitos mayores que los establecidos por la FIFRA. Ello, por entender que, dicho estatuto ocupa el campo. En adición, resaltó que la EPA no había comunicado que la madera tratada con CCA representara un riesgo público, ni que era prohibida. Sustentado en lo anterior alegó que, imponerle responsabilidad por no advertir sobre los riesgos de toxicidad resulta contradictorio. Igualmente, señaló que, el foro primario hizo determinaciones sobre la procedencia de los daños lo cual, según adujo, resultaba irrelevante en esa etapa de los procesos.

Expuso, en la alternativa, que procedía el relevo del dictamen toda vez que advino en conocimiento de que la señora Cardona Aldarondo arrendaba la propiedad a través de la plataforma *Airbnb*, desde abril de 2014. Consecuentemente, indicó que la apelada incurrió en representaciones fraudulentas al incoar la causa de acción y alegar que su propiedad no podía ser utilizada.

En respuesta, la señora Cardona Aldarondo se opuso[10] y sostuvo que su reclamación no estaba ocupada por la FIFRA. Expuso que, su causa de acción excluye reclamaciones sobre *product liability* y que el Código de Construcción de Puerto Rico permite la exigencia de requisitos mínimos, sin involucrar los aspectos de la ley federal. En cuanto a las limitaciones en el uso o disfrute de la propiedad y otros remedios indicó que, es un asunto a dilucidar durante la vista de daños.

Justipreciado lo antes, junto a la *Réplica a Oposición*[11] y la *Dúplica a Solicitud de Reconsideración*,[12] el foro primario emitió una *Resolución*, notificada el 25 de febrero de 2022, en la que determinó

---

[10] SUMAC TA, Entrada Núm. 1, Apéndice 11.
[11] *Íd.*, Apéndice 12.
[12] *Íd.*, Apéndice 13.

reconsiderar su anterior pronunciamiento, a los únicos fines de titularlo "Resolución"[13] y declaró *No ha lugar* el petitorio de reconsideración.[14]

Es preciso destacar que, el 16 de marzo de 2022, la parte apelante recurrió ante nos del referido pronunciamiento de naturaleza interlocutoria, mediante un recurso de *Certiorari* acompañado de una moción en auxilio de jurisdicción (Recurso Núm. KLCE202200306). No obstante, tras declarar no ha lugar el petitorio en auxilio de jurisdicción, notificamos una *Resolución*, el 4 de abril de 2022, mediante la cual denegamos la expedición del auto de *certiorari*.[15]

Superado lo anterior, el foro primario celebró la vista sobre la valorización de los daños. A esos efectos, la parte demandante presentó el testimonio de la señora Gloria Cardona Aldarondo y, por la parte demandada, testificó la Dra. Angelisa Bonilla Espino de Franceschini.[16] Con el propósito de tener una mejor comprensión de la prueba desfilada, a continuación, incluimos un resumen de los referidos testimonios:

### Señora Gloria Cardona Aldarondo[17]

La señora Cardona Aldarondo relató que la propiedad se adquirió el 14 de agosto del 2001, por motivo de su plan de retirarse, cerrar su oficina, para poder vivir en paz y tranquilidad.[18] La casa

---

[13] *Íd.*, Apéndices 14 y 15.

[14] *Íd.*, Apéndices 16 y 17.

[15] *Véase, Cardona v. Maderera Donestevez Incorporada*, KLCE202200306 (30 de marzo de 2022). Mediante *Resolución* emitida el 3 de junio de 2022 (CC-2022-0271) el Tribunal Supremo declaró no ha lugar la *Petición de Certiorari* instada y, a esos efectos, se emitió el Mandato el 26 de octubre de 2022.

[16] Cabe señalar que, en la vista de adjudicación de daños, la parte demandante procuró presentar el testimonio de la perita arquitecta, Toledo García. No obstante, los demandados objetaron oportunamente su testimonio a razón de ser sorpresivo y no surgir de su informe pericial ningún aspecto sobre la estimación de daños. En vista de ello, el Tribunal evaluó el *Informe de Conferencia Preliminar entre abogados* y únicamente se anunció a la perita con relación a su informe sobre el Código de Construcción, uso del CCA y localización de la madera en la residencia. El Tribunal determinó que la testigo no fue anunciada para declarar sobre daños. SUMAC TA, Entrada 5, *Transcripción Estipulada de la Prueba* (TPO), págs. 6-16.

[17] La señora Gloria Cardona Aldorondo (Cardona Aldarondo o testigo) declaró que nació en mayo de 1951, abogada de profesión desde el 1997, y tiene 3 hijos (edades entre los 33 a 47 años) y 5 nietos (edades entre los 17 a 24 años).

[18] SUMAC TA, Entrada 5, *Transcripción Estipulada de la Prueba* (TPO), pág. 18, líneas 15-20.

se terminó de construir en noviembre de 2013.[19] Explicó que, la casa resultó ser el sueño que siempre tuvo[20] pero eventualmente, se convirtió en su infierno porque no la pudo residir.[21]

Indicó que, como a las dos semanas de residir en la propiedad empezó a sentirse mal, a sentirse enferma, con un malestar general de debilidad.[22] Sentía mucho cansancio, sin energía, se acostaba a dormir y cuando se levantaba sentía como si tuviera arenilla en la garganta.[23] Luego le empezaron a doler los músculos y sus piernas se pusieron bien rojas.[24] Informó que, en la parte de atrás de la pierna derecha, le salió una protuberancia y empezó a caminar coja.[25]

Durante su testimonio relató que, entonces observó que, a su alrededor, lo único nuevo y distinto en su vida era la madera de la casa.[26] Empezó a notar que en la casa había un polvillo.[27] Por esta razón, se hizo una prueba de pelo y salió con arsénico.[28] Asimismo, recogió muestra del polvillo y lo llevó al laboratorio. En septiembre del 2014 le dieron los resultados que ese polvillo tenía cromo, cobre y arsénico.[29]

Testificó que, al saber esto, se asustó porque supo que estaba en peligro su vida.[30] Sentía ardor en las comisuras de la boca y en los bordes de las fosas nasales. A veces se levantaba ronca y sin voz. Hubo veces que no podía trabajar porque no podía hablar con los clientes. Cuando tragaba sentía siempre el polvillo. Indicó que, se declaró en quiebra porque tuvo que dejar de trabajar. Ya no tenía los mismos ingresos para pagar sus gastos.[31]

---

[19] *Íd.*, pág. 22, líneas 16-17.
[20] *Íd.*, pág. 20, líneas 12-13.
[21] *Íd.*, pág. 21, líneas 9-10.
[22] *Íd.*, pág. 23, líneas 8-10.
[23] *Íd.*, líneas 13-16.
[24] *Íd.*, líneas 20-24.
[25] *Íd.*, págs. 23-24, líneas 24; 1-2, 9.
[26] *Íd.*, pág. 26, líneas 14-24.
[27] *Íd.*
[28] *Íd.*, pág. 27, líneas 5-9.
[29] *Íd.*, pág. 28, líneas 20-24.
[30] *Íd.*, pág. 29, líneas 10-20.
[31] *Íd.*, pág. 30, líneas 1-5.

La señora Cardona Aldarondo aseveró que estuvo viviendo la propiedad hasta septiembre del 2014.[32] En un principio, estuvo quedándose dos meses en casa de una amiga. Se sentía mendigando y humillada, le daba mucha vergüenza.[33] Luego, llamó a otra amiga, quien le prestó un apartamento. Explicó que, se mudó a ese lugar que estaba totalmente vacío, con un colchón en el piso.[34] "Para mí eso fue frustrante, yo me deprimí, yo me pasaba llorando".[35] Estuvo allí como cuatro meses.[36] "[Y]o me sentía deambulante, como una gitana. Con mucha vergüenza y ahí me tuve que ir otra vez".[37] Luego, se fue a vivir a su oficina como cuatro meses más, porque no tenía a dónde ir y no podía pagar.[38] "A mí eso me hizo mucho daño. He sufrido un montón. El valor propio mío cayó en el piso".[39]

La testigo expresó que a consecuencia de lo antes y hasta el presente, pasó a vivir en el sótano de la estructura, que es un cuarto pequeñito que tuvo que construir y habilitar lo cual resulta ser menos de la tercera parte del tamaño de la casa, con muchos mosquitos, mucha humedad y hongo.[40] La señora Cardona Aldarondo afirmó que, desde que dejó la casa en el 2014, no ha podido disfrutar para nada de esa propiedad.[41]

Respecto a las inversiones en las que tuvo que incurrir, declaró que, para el apartamento en el sótano gastó en materiales como $15,000.00, y a su hermano le estuvo pagando $10,000.00.[42] Además, se gastó $8,000.00 en ponerle losas.[43]

Testificó sobre el *Exhibit* 11, que es un documento redactado por ella, que refleja los gastos en los cuales incurrió en la

---

[32] *Íd.*, pág. 31, líneas 19-21.
[33] *Íd.*, pág. 32, líneas 5-7, 15-23.
[34] *Íd.*, pág. 33, líneas 6-18.
[35] *Íd.*, líneas 23-24.
[36] *Íd.*, pág. 34, líneas 11-13.
[37] *Íd.*, líneas 17-18.
[38] *Íd.*, líneas 19-24; pág. 36, líneas 8-19.
[39] *Íd.*, pág. 37, líneas 3-5.
[40] *Íd.*, págs. 37-38, líneas 15-24; 1-11.
[41] *Íd.*, págs. 39-40, líneas 22-24; 1-2.
[42] *Íd.*, pág. 40, líneas 14-20.
[43] *Íd.*, pág. 42, líneas 9-10.

construcción del apartamento. En particular, abundó en cuanto al contenido que versa sobre los materiales que se utilizaron para la construcción del apartamento, según la factura en aquel momento, y aparece un total general de $6,818.08, más $8,000.00 de mano de obra para un total de $14,818.08.[44]

En relación con el *Exhibit* 9, explicó que es un documento que redactó el cual incluye los gastos en los que incurrió en la construcción de la casa. En materiales refleja $130,068.73, y en mano de obra $48,000.00.[45] Refiriéndose al *Exhibit* 10, testificó sobre los demás gastos y costos por un tratamiento de techo para reducir la emisión del tóxico, cuyo costo fue $1,118.00 en materiales y $5,000.00 en mano de obra, para un total de $184,186.76.[46]

En lo que respecta al *Exhibit* 11, es un documento redactado por la señora Cardona Aldarondo que informa las facturas originales de Maderera, únicamente por las maderas tratadas para la construcción del techo de la propiedad ascendente a $29,842.17 y el costo de construcción de la propiedad en su origen.[47]

La señora Cardona Aldarondo indicó que, desde el 2014 al presente, no le ha dado el uso a la propiedad que quería, no la ha podido vivir, tampoco rentar a largo plazo. Además, declaró que, para el 2021, tramitó la licencia de Turismo sobre alquiler a corto plazo en *Airbnb*, y consiguió como 10 rentas de fines de semana, pero el dinero no fue suficiente. Aclaró que, en ese tipo de alquiler no hay exposición a peligro por ser de dos o tres días que es de corta duración.[48]

De modo que, sobre el proceso de reconstrucción de la propiedad, la testigo expuso que "[t]endría que volver a contratar a un ingeniero para que vigile los procesos porque eso tiene que tener

---

[44] *Íd.*, pág. 45, líneas 10-22.
[45] *Íd.*, págs. 47-48, líneas 17-24; 1-2.
[46] *Íd.*, pág. 49, líneas 1-9.
[47] *Íd.*, págs. 52-53, líneas 5-24; 1-6.
[48] *Íd.*, pág. 54.

unas inspecciones y unas firmas del gobierno... Para que entonces autorice a bajar esas maderas de una forma segura, desmontar la casa para volverla a montar. [D]onde tengo que alquilar jirafas aéreas, porque [s]on tres pisos. Donde tengo que contratar otra vez equipo pesado. [P]orque no es construir, ahora es romper y volver a construir".[49]

A su vez, afirmó que el no haber podido vivir la propiedad desde el 2014 la afectó emocionalmente, "[p]orque era mi vida, mi salud, la vida y la salud de la gente que vaya a mi casa y que se quede", "[p]ara mí ha sido un infierno y es un infierno".[50] Declaró que, en el sótano, cuando llueve mucho se le suben culebritas de la tierra.[51] En fin, le deprime, le da mucha tristeza, tensión y ansiedad.[52]

En cuanto al *Exhibit* 12, la parte demandante informó que son copias de facturas de materiales comprados en Maderera para la construcción de la casa.[53] Por otro lado, el *Exhibit* 13 es una carpeta que contiene los recibos originales de los gastos del apartamento construido en el 2015.[54]

Finalmente, la señora Cardona Aldarondo declaró que esto fue una tragedia para ella, a sus 73 años, el nivel de destrucción que esta reconstrucción implica. Además, va a tener que sumar un gasto de renta de meses ya que implica destruir, desmontar y volver a construir. "Un daño demasia[d]o terrible".[55]

En el contrainterrogatorio indicó que, para los años en que se mudó a las propiedades de sus amigas, además de su oficina, sí tenía otra propiedad en San Juan, la cual estaba rentada.[56] Afirmó que no tiene una cotización sobre los trabajos de reparación

---

[49] *Íd.*, págs. 56-57, líneas 17-24; 1-18.
[50] *Íd.*, pág. 59.
[51] *Íd.*, pág. 60, líneas 21-24.
[52] *Íd.*, pág. 61, líneas 5-6.
[53] *Íd.*, pág. 67.
[54] *Íd.*, pág. 68, líneas 4-7.
[55] *Íd.*, págs. 69-70, líneas 19-24; 1-13.
[56] *Íd.*, págs. 72-73, líneas 4-24; 1-7.

alegados en la demanda.[57] Tampoco el costo unitario de los materiales necesarios para las reparaciones, ni tasación de la propiedad.[58] La testigo adujo que la misma factura de las maderas tratadas es su cotización del material que hay que reemplazar.[59]

Por otra parte declaró que, no tiene un récord médico que contenga la conclusión de que haya sufrido una intoxicación con arsénico.[60] Se trajo como prueba de impugnación una captura de la página *Airbnb* de donde surge que, desde abril de 2014, la señora Cardona Aldarondo estaba anunciando la propiedad para alquiler.[61] No obstante, la testigo indicó que en esos años nunca alquiló la propiedad porque no tenía el permiso de Turismo, sino, hasta el año 2021.[62] Afirmó que las rentas a corto plazo se hicieron solo en el año 2021.[63] En el contrainterrogatorio el abogado la cuestionó sobre reseñas de alquiler para los años 2022 y 2023. Para ello, se presentó la página de *Airbnb* como prueba de impugnación en la cual, en efecto, se detallan reseñas de 8 personas para esas fechas.[64] De este modo, la testigo afirmó que, para el 2021, sí estaban utilizando la propiedad y se había colocado una piscina plástica.[65] Sostuvo además, que en la página de *Airbnb* no incluyó una advertencia relacionada a que la madera estaba tratada con CCA.[66]

En el redirecto, la señora Cardona Aldarondo indicó que desde el 2021 al presente, ha mitigado daños conforme exige la ley, al rentar la propiedad por los plazos cortos y no permitir su deterioro.[67]

---

[57] *Íd.*, pág. 74, líneas 1-12.
[58] *Íd.*, líneas 17-23.
[59] *Íd.*, pág. 75, líneas 17-20.
[60] *Íd.*, pág. 76, líneas 6-11.
[61] *Íd.*, pág. 79, líneas 7-24.
[62] *Íd.*, pág. 80, líneas 2-16.
[63] *Íd.*, pág. 82.
[64] *Íd.*, págs. 90-92.
[65] *Íd.*, págs. 92-93, líneas 23-24; 1-14.
[66] *Íd.*, pág. 94, líneas 2-6.
[67] *Íd.*, pág. 96, líneas 10-20.

**Dra. Angelisa Bonilla Espino de Franceschini**[68]

La perita explicó que el arsénico puede ser orgánico o inorgánico, y que la exposición en el ambiente estaba en su forma natural.[69] En particular afirmó que, se encuentra como un compuesto combinado en el ambiente, por ejemplo, alimentos, aire natural y en la corteza terrestre. La exposición podría ir desde un leve dolor de cabeza, mareos, malestar abdominal. En una exposición leve, los síntomas pueden representar diferentes condiciones, síntomas gastrointestinales, vómitos, náuseas. Si hay una ingesta, podría ser intencional, los síntomas varían desde cambios mentales, hasta la muerte.[70] También, puede causar sintomatología neurológica, que incluiría pues una sensación de parestesia, que es como si tuviera dormida las manos o los pies.[71]

Sobre el expediente médico de la señora Cardona, la testigo indicó que el mismo se elaboró ante la queja subjetiva de la paciente, en donde se comenta a los doctores que había tenido una exposición reciente a arsénico, pero no es constatado por resultados.[72]

Señaló que no surge del expediente que el médico haya evaluado una posible intoxicación con algún tipo de metal o alguna sustancia en el ambiente, que puede causarle estos síntomas, sino que subjetivamente la paciente menciona arsénico. Agregó que, el expediente médico carece de una evaluación del contenido de arsénico, por ejemplo, en la orina.[73] Relató que, en la prueba médica, no hay ninguna conclusión médica que confirme que la paciente tuvo una intoxicación por arsénico.[74] Indicó que, tampoco hay algún hallazgo físico que confirme que tuvo una intoxicación con

---

[68] La doctora Angelisa Bonilla Espino (Bonilla Espino o testigo) fue cualificada durante el juicio en su fondo, el 5 de marzo de 2020, como perita en el aspecto de patología clínica y anatómica. Se admitió en evidencia el *Exhibit* 2 del demandado, Informe Pericial de la Dra. Bonilla Espino de 22 folios.
[69] *Íd.,* pág. 111, líneas 19-22.
[70] *Íd.,* pág. 112, líneas 8-20.
[71] *Íd.,* pág. 113.
[72] *Íd.,* pág. 114, líneas 2-5.
[73] *Íd.,* pág. 114, líneas 15-23.
[74] *Íd.,* pág. 115, líneas 21-24.

arsénico.[75] La testigo afirmó que no tiene ninguna referencia que señale que una hinchazón en las piernas pueda estar asociada a una intoxicación con arsénico ambiental o por ingesta accidental.[76] Expresó que, el expediente médico no refleja que los doctores hayan solicitado que la demandante se realice alguna prueba toxicológica.[77] Por otro lado, la Dra. Bonilla Espino destacó que, dentro del campo de la patología clínica y anatómica, las pruebas de vellos tienen muy poca confiabilidad.[78]

Por último, la perita indicó que el continuar viviendo la propiedad no implica ningún riesgo para la demandante.[79] Respecto a los síntomas que presentaba la señora Cordona Aldarondo, declaró que, su conclusión es que la sintomatología plasmada en el expediente médico es un elemento subjetivo, no constatado por ninguna evaluación médica que haga el correspondiente diagnóstico de intoxicación con arsénico.[80] "[L]os resultados pues demuestran que no tenía niveles de toxicidad de arsénico en este caso".[81]

Evaluada la prueba sobre valorización de los daños, el TPI emitió la *Sentencia Final*, notificada el 31 de julio de 2025, de la cual se apela. En esta ocasión el foro de instancia consignó 50 determinaciones de hechos de la cuales destacamos las siguientes:

> […]
> 3. La demandante tenía 73 años a la fecha de la vista de daños.
> […]
> 5. La demandante construyó la casa en controversia pensando que sería la residencia para ella en su retiro. La describió como la casa de sus sueños.
> 6. La demandante soñaba con vivir en paz y tranquilidad en esa propiedad.
> […]
> 13. La casa fue construida con techos de madera tratada con CCA vendida por Maderera Donestevez. Todas las maderas están incrustadas en el cemento.

---

[75] *Íd.*, pág. 116, líneas 3-6.
[76] *Íd.*, pág. 118, líneas 5-10.
[77] *Íd.*, pág. 119, líneas 2-10.
[78] *Íd.*, pág. 121, líneas 1-6.
[79] *Íd.*, pág. 128-129, líneas 21-24; 1-5.
[80] *Íd.*, pág. 129, líneas 9-24.
[81] *Íd.*, pág. 130, líneas 1-4.

14. Hay muchas áreas de la casa que tienen madera expuesta.

15. En noviembre de 2013 se terminó la construcción y la demandante se mudó a la propiedad.

16. A raíz de los problemas habidos en la residencia, la demandante no ha podido vivir la casa plenamente.

17. A pesar de que la demandante vivió en la casa por un período de tiempo al principio de haberse culminado la construcción de la propiedad, esta comenzó a sentir un malestar general, debilidad, arenilla en la garganta, enrojecimiento en las piernas, entre otros síntomas físicos entre noviembre de 2013 y septiembre de 2014.

18. Luego de descubrirse el problema con la madera utilizada para la construcción, la demandante tuvo que abandonar la casa aproximadamente en 2014.

19. La demandante hizo muestras del polvillo o residuo que se acumulaba en los pisos de la casa provenientes de la madera tratada que arrojaron contenido de arsénico.

20. La demandante se hospedó en casa de una amiga por 2 meses, durmiendo en un sofá plegable, en un área pequeña. Le dio vergüenza estar en esa posición de tener que pedir ayuda y se sintió humillada.

21. Luego de eso una amiga le prestó un apartamento por 4 meses.

22. Ese apartamento estaba vacío, no podía llevar muebles porque era una propiedad que estaba en proceso de ejecución, tuvo que llevar un colchón y tirarlo al piso. Describió que fue frustrante y que se deprimió, se pasaba llorando y tenía dolor físico en las piernas.

23. Eventualmente la demandante no tuvo otra alternativa que mudarse a su oficina, en un segundo piso. Se llevó el colchón que tenía en el apartamento para la oficina. Le dio vergüenza tener que irse a su oficina porque no era un lugar para fines residenciales. Allí vivió como 4 meses hasta que el arrendador le indicó que no podía pernoctar allí.

24. Posteriormente, tomando en consideración el tiempo que ha tardado todo el proceso legal, la demandante optó por habilitar una parte pequeña de la casa de Aguas Buenas para poder vivir. Habilitó un área donde hay columnas de cemento, un cuarto pequeño, baño pequeño, cocina. Lo identifica como un sótano.

25. La demandante identifica que ese espacio que habilitó es menos de una tercera parte de la casa.

26. La demandante incurrió en gastos para habilitar esa área de la casa.

27. Habilitar una pequeña parte de la casa requirió una inversión de $25,000 desglosados en materiales por la suma de $15,000 y mano de obra por $10,000 que pagó poco a poco. Posteriormente, para el año 2018 o 2019 se le instaló losa al piso a un costo de $9,000 aproximadamente, para un total de $34,000.00.

28. La demandante no ha podido vender la casa por los problemas que tiene la madera tratada instalada.

29. La demandante se mudó para el área habilitada en el año 2015.

30. Además de los gastos de construcción, la demandante tuvo que comprar estufa, nevera, un sofá usado y posteriormente instaló gabinetes en el año 2021.

31. La demandante no ha podido disfrutar de la propiedad como era su deseo y su plan original.

32. La demandante ha podido alquilar la residencia mediante plataforma de alquiler a corto plazo en unas pocas ocasiones.

33. Consiguió aproximadamente 10 rentas en fines de semana y no resultó en ganancia para ella ni para cubrir gastos de mantenimiento de la propiedad.

34. La demandante pagó por los materiales que compró para la construcción de la casa.

35. Los gastos de construcción de la casa ascendieron a la cantidad de $130,068.73 más $48,000.00 por mano de obra. También se le dio un tratamiento a los techos para reducir la emisión del tóxico a un costo de $6,118.03 para un total de $184,186.76. Véase *Exhibit* 10 parte demandante.

36. La madera tratada usada para la construcción del techo de la casa tuvo un costo aproximado de $29,842.17. *Exhibit* 11 parte demandante.

37. La demandante no ha sufrido daños físicos como consecuencia de la construcción de la casa con la madera comprada a la parte demandada.

38. La demandante no recibió tratamiento por intoxicación.

39. La demandante no desarrolló condiciones médicas como consecuencia de la construcción con la madera vendida por la demandada.

40. Sin embargo, ha tenido sufrimientos y angustias mentales al no poder disfrutar de su propiedad plenamente. Ha sufrido al ver su calidad de vida deteriorada como consecuencia de esta situación.

41. Para corregir la situación en la casa de la demandante la limpieza no es suficiente. La demandante tendría que remover toda la madera y construir de nuevo su casa. Véase Determinación de Hecho núm. 99 de la Resolución de 22 de febrero de 2024.

42. Corregir el problema conllevaría contratar ingeniero, conseguir permisos, diseño, autorización a bajar las maderas de una forma segura, desmontar y montar nuevamente la madera.

43. Conseguir las personas para hacer el trabajo adecuadamente. Alquilar equipo pesado de construcción, grúas, equipo para poder hacer el trabajo.

44. Resulta necesario remover la madera tratada que emite los residuos tóxicos para que la demandante o cualquier persona pueda ocupar la propiedad de manera permanente.

45. La casa tardó originalmente 9 meses en construirse.

46. Los costos de reconstruir serían muy altos considerando el alza en los precios en general y en específico en los materiales de construcción.

47. La demandante teme por su vida y por su salud. Quedarse prolongadamente en la propiedad es imposible en el estado actual de la propiedad.

[...]

49. Toda la situación relacionada con la casa le ha causado depresión, tristeza, tensión y ansiedad.

50. La demandante declaró no tener un estimado de una cantidad específica de lo que conllevaría la remoción de la madera tratada en controversia en la propiedad. Sin embargo, a base de su experiencia personal durante la construcción de la casa originalmente, sabe que conllevará nuevamente la contratación de personal para obtener permisos, el alquiler y uso de equipo pesado, la contratación de empleados de construcción, que se afectarán las áreas verdes de la casa con el paso de los equipos, que será necesario remover las tejas que son costosas, entre otras cosas que le constan de propio y personal conocimiento a la demandante.[82]

Basado en lo antes, el foro primario concluyó que procedía la concesión de los remedios solicitados en este caso. En particular indicó que, el hecho de que la señora Cardona Aldarondo no desarrollara condiciones médicas, no implicaba que no sufriera daños por causa de la negligencia de Maderera Donestevez. Determinó que, no procedía el resarcimiento por daños físicos. Sin embargo, consideró que la apelada logró probar que comenzó a sentir síntomas físicos extraños luego de haberse mudado a la propiedad. Asimismo, concluyó que, quedó probado que la madera había sido tratada con CCA, la cual no es apta para el uso residencial, y que Maderera Donestevez no advirtió de ello a la apelada, a sabiendas de que la madera fue adquirida para la construcción de una casa.

El TPI hizo constar que, la señora Cardona Aldarondo cumplió con su obligación de mitigar los daños al intentar resolver la controversia extrajudicialmente. Además, determinó que la señora Cardona Aldarondo incurrió en múltiples gastos para habilitar un espacio en su propiedad dónde residir, sin exponerse a la madera tratada. Dictaminó que, el intento de alquilar la propiedad a corto

---

[82] SUMAC TA, Entrada Núm. 1, Apéndice *Sentencia Final* y Apéndice 3.

plazo no fue económicamente viable para cubrir los gastos de mantenimiento de la propiedad.

En adición, el TPI reconoció que la apelada no presentó una cotización o estimado de suma específica del costo para remover la madera tratada, sino que la prueba admitida y creída por el foro primario se basó en el testimonio no impugnado de la demandante sobre su experiencia durante la construcción original de la residencia, así como, de los documentos presentados para sustentar sus alegaciones. Concluyó que, en efecto, resultaba un daño sufrido el hecho de que la propiedad fue construida con un material tóxico e inapropiado para su uso. En adición, la prueba estableció que, para corregir el defecto, la mera limpieza no era suficiente. En todo caso, tendría que remover toda la madera y reconstruir.

Cabe señalar, el TPI consignó que el testimonio de la señora Cardona Aldarondo le mereció entera credibilidad, así como la prueba documental admitida sobre los gastos reclamados. Siendo así, concedió una suma de $184,186.76, por los gastos de construcción de la residencia; $34,000.00, por los gastos de habilitar el pequeño espacio en la propiedad; $200,000.00, por la pérdida del uso y disfrute de la propiedad; y $50,000.00, por las angustias mentales sufridas.

Inconforme, el 27 de agosto de 2025, la parte apelante acude ante nos mediante un *Escrito de Apelación* y señala la comisión de los siguientes errores, a saber:

> PRIMER ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCEDER LA PARTIDA DE $184,186.76 POR "GASTOS DE CONSTRUCCIÓN DE LA CASA", AUN CUANDO LA DEMANDANTE RECONOCIÓ NO TENER COTIZACIÓN ALGUNA PARA ESTABLECER EL COSTO DE REPARACIÓN, Y EN AUSENCIA DE NEXO CAUSAL ENTRE LOS ALEGADOS DAÑOS RECLAMADOS Y LA CONSTRUCCIÓN REALIZADA CON LA MADERA VENDIDA.
>
> SEGUNDO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCEDER LA PARTIDA DE $200,000.00 POR PÉRDIDA DE USO Y DISFRUTE DE LA PROPIEDAD, EN AUSENCIA DE UN NEXO CAUSAL ENTRE LOS ALEGADOS DAÑOS RECLAMADOS Y LA CONSTRUCCIÓN REALIZADA CON LA MADERA VENDIDA.

TERCER ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCEDER LA PARTIDA DE $50,000.00 POR SUFRIMIENTOS Y ANGUSTIAS MENTALES, A PESAR DE QUE LA DEMANDANTE NO PRESENTÓ PRUEBA PERICIAL NI MÉDICA QUE CORROBORARA LA EXISTENCIA DE DICHOS DAÑOS O SU RELACIÓN CAUSAL CON LA CONSTRUCCIÓN DE LA RESIDENCIA.

CUARTO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCEDER LA PARTIDA DE $34,000.00 POR "GASTOS DE CONSTRUCCIÓN DE APARTAMENTO" COMO DAÑO DERIVADO, A PESAR DE QUE LAS DETERMINACIONES DE HECHOS DEL TRIBUNAL ESTABLECEN QUE LA DEMANDANTE NO SUFRIÓ DAÑOS FÍSICOS Y NO DESARROLLÓ CONDICIONES MÉDICAS ATRIBUIBLES A LA CONSTRUCCIÓN CON LA MADERA VENDIDA POR LA DEMANDADA.

En atención a nuestro requerimiento,[83] la parte apelante presentó la transcripción estipulada de la prueba oral presentada durante la vista de daños.[84] Asimismo, presentó un *Alegato Suplementario de la Parte Apelante*,[85] a lo cual la apelada se opuso.[86] Mediante una *Resolución* emitida el 23 de enero de 2026, ordenamos a la Secretaría del TPI que remitiera las regrabaciones de las vistas de negligencia celebradas el 3, 4, 5 y 10 de marzo de 2020.

Con el beneficio de la comparecencia de ambas partes y luego de un estudio detallado de la totalidad del expediente ante nos, de las grabaciones de la vista sobre negligencia y de la transcripción de la prueba oral correspondiente a la vista sobre valorización de daños, procedemos a resolver.

## II.

### A. *La acción de daños y perjuicios*

El Artículo 1802 del hoy derogado Código Civil de 1930, 31 LPRA sec. 5141, vigente a la fecha de los hechos del caso de autos, dispone que, el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado.[87] La culpa o negligencia "consiste en la falta del debido

---

[83] SUMAC TA, Entrada Núm. 4.

[84] *Íd.*, Entrada Núm. 5.

[85] SUMAC TA, Entrada Núm. 7.

[86] *Íd.*, Entradas Núm. 12 y 13.

[87] En nuestro ordenamiento, aunque la normativa vigente es el *Código Civil de Puerto Rico de 2020* (Ley Núm. 55-2020), 31 LPRA secs. 5311, *et seq.*, la versión derogada era la que se encontraba vigente al momento de surgir la controversia de autos. En lo pertinente, el Art. 1815 establece lo siguiente: "La responsabilidad

cuidado, por no anticipar ni prever las consecuencias de un acto u omisión, que una persona prudente y razonable habría de prever en las mismas circunstancias". *Cruz Flores v. Hospital Ryder Memorial, Inc.*, 210 DPR 465, 484 (2022) (énfasis suprimido); *Pérez Hernández v. Lares Medical Center, Inc.*, 207 DPR 965, 976-977 (2021).

En cuanto al daño, este se ha definido como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". *Camacho Rivera v. Richard Mitchell, Inc.*, 202 DPR 34, 42 (2019).[88] De no existir daño o perjuicio, no existirá una obligación de indemnizar. *López v. Porrata Doria*, 169 DPR 135, 151 (2006).[89]

Ahora bien, además de la existencia de un daño real y un acto culposo o negligente, es esencial la existencia de un nexo causal para apoyar una reclamación en concepto de daños y perjuicios. La doctrina de causalidad dispone que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Nieves Díaz v. González Massas*, 178 DPR 820, 844 (2010).[90] Este elemento es imprescindible en una causa de acción de daños y perjuicios, pues vincula al daño directamente con el hecho antijurídico. *Nieves Díaz v. González Massas, supra*, págs. 844-845. Además, el nexo causal está íntimamente ligado con la previsibilidad. *Íd.*, pág. 844.

No obstante, si bien una causa de acción en daños y perjuicios requiere, generalmente, un legitimado pasivo que haya incurrido en una acción u omisión negligente o culposa, nuestro ordenamiento jurídico contempla algunas situaciones en las cuales no siempre hay que probar la culpa o negligencia del que es llamado a responder.

---

extracontractual, tanto en su extensión como en su naturaleza, se determina por la ley vigente en el momento en que ocurrió el acto u omisión que da lugar a dicha responsabilidad." 31 LPRA sec. 11720. Por tanto, para propósitos del presente caso, se hará referencia a las disposiciones de la legislación derogada.

[88] Citando a J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Bosch, 1983, T. 2, Vol. 3, pág. 92.

[89] Citando a J. Puig Brutau, *op. cit.*, pág. 91.

[90] Citando a *Sociedad de Gananciales v. Jerónimo Corp.*, 103 DPR 127, 134 (1974).

Lo anterior es comúnmente conocido como responsabilidad objetiva o *strict liability*.

De otra parte, corresponde destacar que, los daños se dividen en patrimoniales y no patrimoniales. *Sagardía de Jesús v. Hosp. Aux. Mutuo,* 177 DPR 484, 505 (2009). Los primeros consisten en el menoscabo monetario sobre el patrimonio del perjudicado. *Íd.,* págs. 505-506. Por su parte, los daños no patrimoniales "son en principio aquellos cuya valoración en dinero no tiene la base equivalencial que caracteriza a los patrimoniales, por afectar precisamente a elementos o intereses de difícil valoración pecuniaria". *Íd.,* pág. 506.[91]

De otra parte, la valoración en dinero de los daños no patrimoniales no tiene la base de equivalencia matemática que caracteriza a los patrimoniales. Sin embargo, esto no significa que los sufrimientos, las angustias mentales y los daños emocionales dejan de ser compensables. Los daños morales pueden ser de tal magnitud que su importancia exceda a la de cualquier daño material sufrido. *Santini Rivera v. Serv. Air, Inc.,* 137 DPR 1, 7–9 (1994). El daño moral es un concepto abarcador que incluye desde el dolor y lesiones físicas o corporales hasta las angustias mentales. *Sagardía de Jesús v. Hospital, supra,* págs. 506–507.

En particular, la partida de sufrimientos y angustias mentales tiene el propósito de compensar el dolor, los sufrimientos físicos y las angustias mentales que padece una persona como consecuencia de un acto culposo o negligente. *Cintrón Adorno v. Gómez,* 147 DPR 576, 597 (1999). La compensación por angustias mentales pretende atender un daño que es intangible, por tanto, supone una mayor dificultad para su evaluación.

---

[91] Citando a J. Santos Briz, *Tratado de Derecho Civil,* Barcelona, Bosch, 2003, T. III, pág. 457.

Enfatizamos, los daños morales son los infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado. A. J. Amadeo Murga, *El Valor de los Daños en la Responsabilidad Civil*, 3.ª ed., Barcelona, Bosh Editor, 2019, T. 1, pág. 176. El dolor mental se ubica en nuestro cerebro y en nuestro sistema emotivo. De modo que, debe probarse que en alguna medida apreciable el demandante quedó realmente afectado en su salud, bienestar o felicidad. *Íd.*, pág. 179.

Ahora bien, una pena pasajera no es suficiente, toda vez que deben probarse sufrimientos y angustias morales profundas. *Moa v. E.L.A.*, 100 DPR 573, 587 (1972). Como antes mencionamos, la labor de estimar y valuar daños no se reduce a simples cálculos matemáticos. *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 909 (2012). Se trata de un proceso complejo y desafiante, ya que no existen ecuaciones científicas de especificidad que indiquen cómo se justiprecia el dolor y el sufrimiento humano. *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 DPR 774, 791 (2010).

El juzgador debe medir los daños sobre una estricta base de correspondencia con la prueba presentada, procurando siempre que la indemnización no se transforme en una industria, ni afecte la economía. En ese sentido, el deber de los jueces es conservar el sentido reparador y no punitivo que caracteriza nuestro ordenamiento jurídico. *Rivera v. Tiendas Pitusa, Inc.*, 148 DPR 695, 700 (1999). A su vez, el proceso de valoración y compensación de daños intangibles como las angustias, la tristeza y el dolor, siempre estará teñida de cierto matiz de especulación. Toda adjudicación debe ser razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionadamente alta. *Riley v. Rodríguez Pacheco*, 119 DPR 762, 805 (1987).

Por otra parte, el Máximo Foro ha preceptuado que, para evaluar si la compensación concedida por el Tribunal de Primera

Instancia es ridículamente baja o exageradamente alta, se debe examinar la prueba desfilada ante ese foro y las cuantías otorgadas en casos similares resueltos anteriormente. *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490-491 (2016). En particular, las indemnizaciones concedidas en casos anteriores constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario. *Íd.* Hay que tener presente que, no existen dos casos exactamente iguales y cada caso es distinguible, según sus circunstancias particulares. *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, supra. Sin embargo, las compensaciones otorgadas en casos anteriores se deben ajustar a su valor presente. *Santiago Montañez v. Fresenius Medical*, supra.

**B.**     ***La doctrina de productos defectuosos o product liablity***

Una de las modalidades reconocidas de responsabilidad objetiva es aquella referente a los productos defectuosos, igualmente conocida como *product liability*. *González Cabán v. JR Seafood et al.*, 199 DPR 234, 241 (2017). El propósito de dicha figura jurídica es "asegurar que el costo de los daños resultantes de productos defectuosos sea sufragado por los fabricantes o vendedores que introdujeron los productos al mercado". *Montero Saldaña v. Amer. Motors Corp.*, 107 DPR 452, 461 (1978).

El promovente de una acción en daños y perjuicios bajo la figura de *product liability* tiene la carga probatoria de establecer los siguientes elementos: (1) la existencia de un defecto en el producto, ya sea de fabricación, de diseño, **o por la insuficiencia de advertencias o instrucciones**; (2) el defecto existía cuando el producto salió del control de la persona demandada; (3) la persona demandada está en el negocio de vender o distribuir el producto; (4) el defecto es la causa adecuada de los daños sufridos por el demandante; y, (5) el demandante utilizó el producto de forma

razonable y previsible para la persona demandada. *Rodríguez Méndez v. Laser Eye*, 195 DPR 769, 780-781 (2016).

El Tribunal Supremo de Puerto Rico ha catalogado un producto como *defectuoso* "si el fabricante o vendedor no le ofrece al usuario o consumidor aquellas advertencias o instrucciones que sean adecuadas en torno a **los peligros o riesgos inherentes** en el manejo o uso del producto". (Énfasis nuestro.) *Aponte v. Sears Roebuck de PR, Inc.*, 144 DPR 830, 840 (1998).[92]

Particularmente, el producto se considera defectuoso, en atención a que las advertencias o instrucciones sobre su uso y manejo fueron insuficientes: (1) cuando los riesgos de uso del producto no son aparentes ni anticipables por los usuarios o consumidores; (2) en el caso de productos inevitablemente peligrosos, aunque sean útiles; o (3) cuando no se corrobora la efectividad de los avisos o las instrucciones. *Aponte v. Sears Roebuck de PR, Inc.,* supra*,* pág. 840. En adición, el ofrecimiento de advertencias suficientes sobre un producto busca asegurar que el consumidor lo utilice sabiamente, reduciendo el riesgo de una posible lesión, y promover la autonomía individual en el proceso decisional sobre la adquisición del producto. *Íd.*, págs. 840-841.

Asimismo, las obligaciones inherentes al deber de brindar instrucciones o advertencias sobre el producto incluyen: (1) ofrecer instrucciones sobre el manejo del producto; **(2) advertir sobre posibles riesgos en el uso del producto, ya sean latentes u ocultos**; (3) alertar sobre las consecuencias dañinas que puedan surgir al utilizar el producto de forma incorrecta; y, (4) ofrecer instrucciones sobre la forma de evitar lesiones, así como instrucciones sobre el tratamiento de primeros auxilios en caso de una lesión. *Íd.*, pág. 841. Nótese que, por ser absoluta, este tipo de responsabilidad no depende de la culpa o negligencia del legitimado

---

[92] Citando a *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 DPR 115, 130 (1992).

pasivo, por lo que, basta establecer el nexo causal y el daño. *Montero Saldaña v. Amer. Motors Corp.*, supra, págs. 462-464.

Ahora bien, es preciso determinar si la información provista fue adecuada, tomando en cuenta la naturaleza del producto y sus posibles usos. *Aponte v. Sears Roebuck de PR, Inc.,* supra, pág. 841. Además, es necesario corroborar si el fabricante sabía o debió haber sabido del peligro o riesgo implicado. *Íd.; Rivera et al. v. Superior Pkg., Inc. et al.,* supra. En ese sentido, la responsabilidad dependerá de si las deficiencias de las advertencias hicieron el producto uno más peligroso de lo que esperaría un consumidor ordinario. *Aponte v. Sears Roebuck de PR, Inc., supra,* pág. 841.

De igual forma, debe analizarse la naturaleza del peligro implicado; la forma en que se utiliza el producto; la carga económica que se impone al fabricante, al requerirle incluir instrucciones o advertencias; y la probabilidad de que una advertencia en particular alertará de forma adecuada a los usuarios o consumidores sobre los riesgos que representa el uso del producto, ya sea correcta o incorrectamente. *Íd.*, pág. 842.

Igualmente, es preciso destacar que, el defecto no se extiende a todo riesgo imaginable, ya que la persona fabricante o vendedora no es aseguradora absoluta de todas las lesiones que pueda producir su producto. Roberto Abesada-Agüet, *Jurisprudencia Reciente sobre Responsabilidad Civil Extracontractual: Productos Defectuosos*, 53 Rev. Jur. UIPR 761, 766 (2019). Como vimos, se estará sujeto a responsabilidad civil por los daños relacionados previsiblemente con el defecto y el uso del producto. *Íd.*

Además, el hecho de que el producto sea inherentemente peligroso, por su naturaleza, no implica la exclusión de indemnización por daños y perjuicios, pues la advertencia o instrucción adecuada puede reducir el riesgo de que se produzcan los daños. *Aponte v. Sears Roebuck de PR, Inc.,* supra, pág. 843. En

ese sentido, le corresponderá al juzgador examinar, a la luz de la totalidad de las circunstancias, si el aviso fue adecuado, si fue la causa próxima de los daños y si no hubo una causa interventora o concurrente. *Íd.*

## C.    *La apreciación de la prueba*

Como regla general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los foros inferiores, sin intervenir con la apreciación y la adjudicación de credibilidad que realiza el juzgador de los hechos, en relación con la prueba testifical. *Pueblo v. Negrón Ramírez*, 213 DPR 895 (2024). Ello, debido a que, "[l]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778-779 (2022).[93] Después de todo, es el juzgador de los hechos o el jurado quien escucha la prueba testifical y evalúa el comportamiento de los declarantes. *Pueblo v. Negrón Ramírez,* supra.

Cónsono con lo anterior, nuestro Máximo Foro ha resuelto que, los tribunales apelativos intervienen con la apreciación de la prueba cuando: (1) el apelante demuestra la existencia de pasión, prejuicio, parcialidad o error manifiesta; o (2) si la apreciación de la prueba no concuerda con la realidad fáctica o esta es inherentemente imposible o increíble. *Pueblo v. Negrón Ramírez,* supra. A esos efectos, la parte que impugne la apreciación de la prueba es la parte encargada de señalar y demostrar la base para la intervención apelativa. *Pueblo v. Cabán Torres*, 117 DPR 645 (1986).

La Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, dispone que las determinaciones de hechos que surgen de algún testimonio oral no se dejarán sin efecto a no ser que se demuestre

---

[93] Citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013).

que son claramente erróneas. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 810-811 (2009). Estas determinaciones de hechos, basadas en la credibilidad que el juzgador le adjudicó al testimonio ante sí, merecen gran deferencia. *Trinidad v. Chade*, 153 DPR 280, 291 (2001). Así, únicamente intervendremos con este tipo de determinaciones de hechos cuando un análisis integral de tal prueba cause, en nuestro ánimo, una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia. *Rivera Menéndez v. Action Services*, 185 DPR 431, 444 (2012).

El Tribunal de Apelaciones está en la misma posición que el juzgador de los hechos para evaluar la prueba documental que ante ese foro se presentó. *Trinidad v. Chade*, supra, pág. 292. Así, la prueba documental es susceptible de una evaluación independiente por parte de los foros revisores; al evaluarla, el Tribunal puede adoptar su propio criterio. *Rivera v. Pan Pepín*, 161 DPR 681, 687 (2004).

Por otro lado, y según la normativa vigente, en los casos de naturaleza civil, la determinación del juzgador se hará mediante la preponderancia de la prueba, a base de criterios de probabilidad.[94] El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.[95] La obligación de presentar evidencia recae primeramente sobre la parte que sostiene la afirmativa en el asunto en controversia.[96] Así pues, en los casos de naturaleza civil, la regla general es que la obligación de presentar evidencia y persuadir al juzgador de la existencia de los elementos esenciales de una reclamación recae sobre el demandante. *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 913 (2011). Asimismo, las Reglas

---

[94] Regla 110(F) de Evidencia, 32 LPRA Ap. VI R. 110(F).
[95] Regla 110(A) de Evidencia, *supra*, R. 110(A).
[96] Regla 110(B) de Evidencia, *supra*, R. 110(B).

de Evidencia establecen que **la evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho**.[97]

Expuesto el marco jurídico aplicable, procedemos a atender los errores señalados.

### III.

En su primer señalamiento de error, la parte apelante impugna la cuantía otorgada de $184,186.76 por "gastos de construcción de la casa". Aduce que, hubo total ausencia de prueba sobre la partida concedida y falta de nexo causal entre los daños y la construcción realizada con la madera vendida. Sostiene que, el Tribunal la otorgó a base de conjeturas sobre lo que hipotéticamente habría de implicar las reparaciones de la residencia.

Mientras que, la apelada argumenta que, tras haber evaluado la prueba pericial, el TPI estableció que la madera era un producto defectuoso e inapropiado para su uso residencial. Así, pues, el daño provocado es la pérdida total de la estructura construida. Resalta que, el foro primario correctamente determinó que se estableció la causalidad entre los actos y las omisiones de la parte apelante y los daños causados. Además, la apelada discute que el TPI, en su sano juicio y discreción, utilizó el costo original de la construcción como la medida más justa y razonable para compensar la pérdida de su inversión. Añadió que, el foro de instancia no incidió al basar su adjudicación en el valor de lo perdido, es decir, la casa misma.

Examinados cuidadosamente los planteamientos de las partes, así como la totalidad del expediente ante nos, las grabaciones del juicio en su fondo y la transcripción de la prueba oral, colegimos que no procede intervenir con la apreciación de la prueba sobre este asunto. De la prueba admitida y creída por el TPI se estableció que la residencia de la señora Cardona Aldarondo se

---

[97] Regla 110(D) de Evidencia, *supra*, R. 110(D).

encuentra construida con madera tratada, impregnada con un material altamente tóxico. La madera tratada con el preservativo CCA, se utilizó alrededor de toda la propiedad. Enfatizamos, toda la casa se encuentra cubierta con dicho material. Según consignado en las determinaciones de hechos del Tribunal, "**para corregir esta situación en la casa, [l]a demandante tendría que remover toda la madera tratada vendida y construir de nuevo su casa**".[98]

Según se discute en el recurso, la parte apelante cuestiona la causalidad para cada una de las partidas conferidas. Según alega, hay ausencia de nexo causal entre los daños adjudicados y la construcción realizada con la madera vendida. No le asiste la razón.

Conforme a la prueba desfilada y las determinaciones de hechos del Tribunal de Instancia: 1) el CCA no está permitido para utilizarse en madera de uso residencial por contener arsénico, un elemento que, dependiendo de la exposición, puede tener efectos tóxicos y es carcinógeno; 2) la madera adquirida por la señora Cardona Aldarondo fue vendida por la parte apelante; 3) la madera está tratada con *Wolman Concentrate 60%*, el cual es el nombre comercial del producto con CCA; 4) la parte apelante conocía el uso que se le daría a la madera, en particular, la construcción de una residencia; 5) la madera utilizada como material de construcción primario de la residencia adolece de los sellos y advertencias necesarias; 6) la parte apelante incumplió con su deber de advertir al comprador sobre el tratamiento prestado a la madera; 7) el particulado del CCA afecta a las personas dentro de la propiedad debido a su toxicidad; 8) la dosis de exposición es alta porque en una propiedad de uso residencial, la persona está entre 8 a 12 horas en la residencia; 9) si la exposición a arsénico permanece durante mucho tiempo se expone a tener efectos crónicos en la salud; 10)

---

[98] *Resolución*, determinación de hecho número 99. SUMAC TA, Entrada Núm. 1, Apéndices 16 y 17.

para corregir el problema de la propiedad hay que remover toda la madera y construir de nuevo la casa.

Ciertamente, la señora Cardona Aldarondo no probó mediante preponderancia de prueba que desarrolló condiciones médicas. Tampoco presentó una cotización para las reparaciones, ni una tasación de la propiedad. No obstante, tales hechos no anulan la relación causal de la negligencia imputada y los daños sufridos ante el riesgo a la salud que implica la exposición al CCA, el cual contiene los componentes químicos cobre, cromo y arsénico. Incluso, no anulan la realidad de que la propiedad no es apta para residirla debido a que supondría una dosis alta de exposición al CCA. A tales efectos, concluimos que sí se estableció una relación de nexo causal. En particular, residir en una propiedad que está construida de madera tratada con CCA como material principal, coloca a la persona en una circunstancia en la que se expone a desarrollar condiciones crónicas de salud. Por tanto, se frustró el disfrute de una propiedad con fines residenciales.

Ahora bien, en cuanto al ejercicio de valorización efectuado por el foro primario, no existe controversia en cuanto a que la demandante admitió que no contaba con informe o cotización para establecer los costos de reparación. Así quedó consignado en las determinaciones de hechos del TPI, en particular: "la demandante declaró no tener estimado de una cantidad específica de lo que conllevaría la remoción de madera tratada…".[99] No obstante, el TPI consideró como suficiente los recibos de materiales que establecen el costo total de construcción de la casa cuando se construyó originalmente. Asimismo, justipreció -dentro de su sana discreción- que el testimonio de la apelada y el resumen de las facturas

---

[99] *Sentencia Final*, determinación de hecho número 50. SUMAC TA, Entrada Núm. 1, Apéndice *Sentencia Final* y Apéndice 3.

relacionadas con la construcción original de la residencia cumplió con el quantum de la prueba necesaria.

Luego de revisar la transcripción de prueba oral y los autos originales, colegimos que, surge con claridad que se admitieron los *Exhibit* 10 y 11,[100] sin mayor objeción o alegación oportuna de la parte apelante, en cuanto a su contenido, tampoco sobre el alegado impedimento del TPI para considerar el testimonio de la apelada sobre los gastos de construcción original a efectos de adjudicar las partidas por daños.[101] Como se sabe, el foro primario posee una amplia discreción, y así la ejerció, al atribuir entera credibilidad y suficiente valor probatorio a la totalidad de la prueba presentada por la señora Cardona Aldarondo. De esta forma, el TPI sustentó su determinación de conceder los remedios pertinentes. Nada hemos encontrado en las alegaciones de la parte apelante ni en la evidencia elevada ante nos, que nos ponga en posición de intervenir con la apreciación del tribunal inferior. Conforme a lo anterior, resolvemos que el primer error no se cometió.

En el segundo error, la parte apelante cuestiona la cuantía de $200,000.00 por concepto de pérdida de uso y disfrute de la residencia, en ausencia de un nexo causal. Indica que, no existe pérdida de uso y disfrute por cuanto la apelada habilitó un espacio de la propiedad para residir (sótano), desde el 2015 hasta el presente. Además, señala que la demandante reconoció que utilizó la residencia como alquiler de corto plazo por la plataforma de *Airbnb*.

En cambio, la apelada plantea que, ha subsistido como refugiada en un sótano habilitado por necesidad. Asimismo, expone que el hecho de que por necesidad económica y en cumplimiento con su deber de mitigar daños, haya alquilado la propiedad en

---

[100] *Gastos en la Construcción de Casa Aguas Buenas y Facturas Originales de Maderera Don Estevez (2013).*
[101] TPO, págs. 47-48, líneas 22-24; 7-11. Además, págs. 52-53, líneas 5-24; 1-17.

contadas ocasiones, no anula el hecho de que se vio privada del uso y disfrute pleno, pacífico y seguro de su hogar desde el 2014 hasta el presente.

Luego de un análisis de las posturas de las partes, con el beneficio de los autos originales y de la transcripción de la prueba oral concluimos que, el TPI no incidió en su apreciación de la prueba sobre esta partida. Además, la parte apelante no nos ha puesto en posición para revertir este pronunciamiento particular. El foro primario correctamente concluyó que, de la prueba oral vertida en juicio se desprende que, el riesgo del arsénico para la persona que reside en la vivienda proviene de la dosis de exposición. Esto es, los riesgos para una persona residente, quien se encuentra en la propiedad a diario, por un periodo prolongado de tiempo, resulta en un estado distinguible de quien pudiera haber ocupado la residencia en un alquiler de corto plazo. Ante esta realidad, la señora Cardona Aldarondo tuvo que optar, por último, en residir en el sótano. En esto se traduce la pérdida de uso y disfrute de la propiedad. A su vez, el TPI consideró que, el alquiler a corto plazo se realizó en un intento de cubrir los gastos de mantenimiento de la propiedad.

Como es sabido, el Tribunal Supremo ha expresado reiteradamente que los tribunales revisores no debemos intervenir con las determinaciones de los foros de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba. *Santiago Montañez v. Fresenius Medical*, supra. De conformidad dictaminamos que, el segundo error tampoco se cometió.

Mediante el tercer señalamiento de error, la parte apelante cuestiona la adjudicación de $50,000.00 en angustias y sufrimientos mentales. Arguye que, al no haberse probado intoxicación, ni daño físico alguno, no procedía conceder compensación por sufrimientos emocionales. A lo antes, la apelada

se opone y afirma que, la jurisprudencia es clara al establecer que los sufrimientos y angustias mentales son compensables por sí mismos, sin necesidad de estar atados a una lesión física.

Tal y como apunta la apelada, no procede en derecho condicionar la ocurrencia de daños físicos, para que se reconozca el daño moral por sufrimientos y angustias mentales. Como antes mencionamos, el dolor mental se ubica en el sistema emotivo de los seres humanos. De modo que, debe probarse que, en alguna medida apreciable la demandante quedó realmente afectada en su salud, bienestar o felicidad. Amadeo Murga*, op. cit.,* pág. 179. Recalcamos, los conceptos de "salud, bienestar o felicidad" no están estrictamente relacionados a la ocurrencia de una lesión física.

A la luz de lo esbozado, los daños morales son los infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado. Amadeo Murga*, op. cit.,* pág. 176. El proceso de valoración y compensación de daños intangibles como las angustias, la tristeza y el dolor, siempre estará teñida de cierto matiz de especulación. Toda adjudicación debe ser razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionadamente alta. *Riley v. Rodríguez Pacheco*, supra.

En ese sentido, los tribunales revisores debemos intervenir con la indemnización concedida solamente cuando, tomando en cuenta las concesiones por daños en casos similares anteriores actualizadas al momento de la sentencia, y a la luz de las circunstancias particulares del caso ante la consideración del Tribunal, la cuantía concedida se desvía manifiestamente de lo que sería una indemnización razonable por ser "ridículamente baja o exageradamente alta". *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, supra, pág. 787.

Expuesto este trasfondo doctrinario apreciamos que, el señalamiento de error de la parte apelante está sustentado en un análisis errado de derecho. La parte apelante se equivoca en respaldar su cuestionamiento sobre la partida concedida por sufrimientos y angustias ante la inexistencia de hechos probados por daños físicos. Resulta evidente que, en el caso de autos, la señora Cardona Aldarondo no probó mediante preponderancia de prueba que desarrolló condiciones médicas, por lo cual, el foro primario no ordenó remedio alguno por dicha partida. No obstante, la apelada logró establecer, mediante preponderancia de la prueba admitida y creída por la juzgadora de los hechos, otros elementos del daño moral como lo son, por ejemplo, las angustias y la tristeza. En ausencia de argumento alguno de la parte apelante cuestionando las cuantías mediante precedentes, conforme exige la normativa antes reseñada, o en su defecto, estableciendo el presunto abuso en la apreciación de la prueba, consideramos que la parte apelante no nos ha puesto en posición de intervenir con este asunto y resolver lo contrario.

Constatamos que, el testimonio de la demandante le mereció entera credibilidad al TPI. Según la transcripción de prueba oral, la demandante describió su sentir como: era un infierno, se sentía mendigando y humillada, le daba mucha vergüenza, frustrante, se deprimió y se pasaba llorando, se sentía deambulante, como gitana, le hizo mucho daño, sufrió un montón, su valor cayó en el piso, la situación la deprime, le da mucha tristeza, tensión y ansiedad, es una tragedia para ella a sus 73 años, entre otras expresiones. No se ha de intervenir con la apreciación y la adjudicación de credibilidad que realizó el juzgador. Ante ello, el tercer error no se cometió.

Por último, en el cuarto error, la parte apelante impugna la partida de $34,000.00 por "gastos de construcción de apartamento",

a pesar de que la demandante no sufrió daños físicos y no desarrolló condiciones médicas atribuibles a la construcción con la madera.

Por su parte, la apelada sostiene que la decisión de habilitar el sótano fue una consecuencia directa de la negligencia de los apelantes, así como, una medida razonable para mitigar daños. Indicó que se presentó prueba de los gastos incurridos, costos directos y necesarios que le permitieron tener un techo sin incurrir en el gasto continuo de un alquiler.

Evaluadas las posturas resolvemos que, los argumentos esbozados por la parte apelante no nos convencen. Según discutido, debido al grado de exposición y al riesgo a la salud que supone residir en la propiedad, la señora Cardona Aldarondo incurrió en unos gastos para habilitar un espacio pequeño de la casa (el sótano) para vivir, sin tener tanta exposición a las maderas tratadas con CCA.

Tras un estudio detenido del expediente, los autos originales y la transcripción de la prueba, notamos que el TPI consideró para esta cuantía el *Exbibit* 9 "Gastos de la construcción del Apartamento Aguas Buenas" en donde se desglosan, unas facturas que ascienden a $6,818.08, más escrito a mano, $8,000.00 por mano de obra, para un total de $14,818.08. Además, el *Exbibit* 13 que contiene unos recibos originales de materiales para la construcción del apartamento, suma que asciende a $9,245.71. Ahora bien, le mereció entera credibilidad el testimonio de la apelada que reafirma los gastos en el apartamento, en particular, $15,000.00 en materiales, $10,000.00 en mano de obra, y $8,000.00 en losas, aproximadamente. El TPI determinó, "[a]demás de los gastos de construcción, la demandante tuvo que comprar estufa, nevera, un sofá usado y posteriormente instaló gabinetes en el año 2021".[102]

---

[102] *Sentencia Final*, determinación de hecho número 30. SUMAC TA, Entrada Núm. 1, Apéndice *Sentencia Final* y Apéndice 3. Véase, además, TPO, pág. 43.

La parte demandante estableció mediante preponderancia de la prueba que tuvo que incurrir en unos gastos para habilitar un espacio de la residencia (el sótano). Esto, debido a que la exposición a madera con arsénico durante mucho tiempo puede tener efectos crónicos en la salud. Ese espacio pequeño es en donde la apelada reside desde el 2015 hasta el presente. Ante las determinaciones de hecho que realizó el juzgador, no se cumple con los criterios de error manifiesto, pasión, prejuicio o parcialidad, con la apreciación de la prueba realizada que nos permita ejercer nuestra facultad revisora a la cuantía conferida. De esta forma, resolvemos que el cuarto error no se cometió.

**IV.**

Por los fundamentos que anteceden, confirmamos la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones